UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ZERRAD AOUATIF,

                Plaintiff,

       - against -

THE CITY OF NEW YORK; NEW YORK CITY
HEALTH AND HOSPITALS CORPORATION; NABIL
KOTBI; AND JOHN DOES 1–10,

                Defendants.
------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM & ORDER**
07-CV-1302 (RRM) (JO)

Plaintiff Zerrad Aouatif filed this lawsuit, alleging deprivations of her Fourth, Eighth, and Fourteenth Amendment rights, arising from a 2005 incident in which her state-employed former psychiatrist, Dr. Nabil Kotbi, called 911 and requested that police officers transport Aouatif to a hospital for an emergency psychiatric evaluation.  Before the Court is defendants' motion for summary judgment and Aouatif's opposition thereto.  For the following reasons, defendants' motion is granted in its entirety.

## BACKGROUND

### I.    Factual Background

The material facts are taken from the parties' Local Rule 56.1 statements, Aouatif's second amended complaint, and the affidavits and exhibits submitted in connection with defendants' motion for summary judgment and Aouatif's opposition thereto.  The facts are uncontested, except where otherwise noted.

#### A.  The Parties

Plaintiff Zerrad Aouatif was born in Morocco, and has resided in New York City since 1984.  Aouatif received outpatient mental health treatment from doctors at various facilities from

at least July 2001 until December 2007, and she has received social security income disability benefits since 2003 based on a determination that she was unable to work because of depression. (*See* Defs.' 56.1 (Doc. No. 52), Pl.'s 56.1 (Doc. No. 58) ¶¶ 1–6.)

Defendant Dr. Nabil Kotbi was also born and raised in Morocco, where he received a medical degree in 1996. Kotbi immigrated to the United States in 1997, and passed a series of examinations required for foreign-language doctors to practice medicine in the United States. From 2002 until 2005, Kotbi was employed as a resident in psychiatry at SUNY Downstate Medical Center and, through an affiliation with Kings County Hospital ("Kings County"), worked at Kings County and was employed by the New York City Health and Hospitals Corporation ("HHC"). Kotbi received his medical license and was promoted to the position of Senior Chief Psychiatric Resident at Kings County in 2004, a position he held until he completed his residency in June 2005. (*See* Defs.' & Pl.'s 56.1 ¶¶ 14–27.)

HHC is a municipal corporation engaged in the business of providing medical services to the public. John Does 1–10 are unidentified police officers who responded to Kotbi's 911 call on June 11, 2005.

B.  Aouatif's Treatment with Dr. Kotbi and the Events of June 11, 2005

Aouatif began experiencing depression after a 2001 incident at her former university. (*See* Aouatif Dep., Ex. 5 to Pl.'s Mot. (Doc. No. 59-7), Ex. K to Defs.' Mot. (Doc. No. 56-12) at 17–18.)[1] She sought psychiatric counseling, but, because of a language barrier, found it difficult to express her feelings to her counselor in English. (*See* Defs.' & Pl.'s 56.1 ¶ 30.) She sought treatment from a doctor who understood her culture and language and was referred to Dr. Kotbi in 2004 by her roommate, a former patient of Kotbi's. (*See id.* ¶ 31.) Aouatif's first formal

---

[1] All citations refer to ECF pagination, except for citations to depositions, which use the pagination of paper copies.

therapy session with Kotbi was in September 2004, and they usually saw each other on a weekly basis.  (*See id.* ¶ 36.)  Aouatif alleges that Kotbi acted inappropriately from the outset by making sexual remarks and asking her inappropriate questions of a sexual nature, and that Kotbi persisted in this behavior even after she repeatedly told him to stop.  (*See* Aouatif Aff. (Doc. No. 59-3) ¶¶ 5–6.)  During the time she was seeing Kotbi, Aouatif simultaneously received treatment from Dr. Gamal, a psychologist employed at Brookdale Hospital ("Brookdale").  (*See* Defs.' & Pl.'s 56.1 ¶ 37.)

In their private sessions, Dr. Kotbi found Aouatif to be soft-spoken.  (*See* Kotbi Dep., Ex. 7 to Pl.'s Mot. (Doc. No. 59-8), Ex. L to Defs.' Mot. (Doc. No. 56-13) at 25.)  He diagnosed Aouatif with several psychiatric conditions, including "ideation of being psychotic," borderline personality disorder, and "a rule out of schizophrenia of the chronic paranoid type." (*See id.* at 25–26).  An intake evaluation conducted by a doctor at Kings County notes that Aouatif reported an incident of suicide ideation in 2002.  (*See* Kings County Medical Record, Ex. N to Defs.' Mot. (Doc. No. 56-15) at 7.)  Kotbi also testified that Aouatif had experienced suicidal ideas and gestures in the past.  (*See* Kotbi Dep. at 29.)  In Kotbi's first formal session with Aouatif, he noted in the medical record that she told him she attempted to jump off the roof of her school in 2001 after learning she was expelled.  (*See* Defs.' & Pl.'s 56.1 ¶ 36; Kings County Medical Record at 12.)  Although Aouatif states in this action that she has never attempted to jump off a building, and that she has never told Kotbi otherwise, (*see* Aouatif Aff. ¶ 12), the Court notes that in her 56.1 Statement, Aouatif does not affirmatively disavow the medical record memorializing her first session with Kotbi, and only appears to dispute the date of that session. (*See* Pl.'s 56.1 ¶ 36.)  The parties stipulated to the admissibility of Aouatif's psychiatric records

from Kings County, as well as her psychiatric records from Brookdale for June 11-13, 2005. (*See* Joint Pretrial Order, Ex. H to Defs.' Mot. (Doc. No. 56-9) at 10.)

At the time she was seeing Kotbi for treatment, Aouatif was pursuing a lawsuit against her former university regarding the 2001 incident at school, alleging discrimination based on her Arab ethnicity. (*See* Defs.' & Pl.'s 56.1 ¶ 10.) Specifically, she alleged, *inter alia*, that her professor, who was also of Arab ethnicity, pushed her to the floor and barred her from the classroom. (*See id.* ¶ 11.) Aouatif thought that her medical records from Kotbi would be useful in that suit, and so she signed documents authorizing Kotbi to turn those records over to her lawyer. (*See* Aouatif Aff. ¶¶ 8–9.) However, she did not authorize him to speak with her lawyer. (*See id.* ¶ 9.) According to Aouatif, Kotbi refused to turn over the documents and, against Aouatif's wishes, called her lawyer. (*See id.*)

Upset that Kotbi had disobeyed her wishes, Aouatif called his cell phone in the early afternoon on Saturday, June 11, 2005, to confront him. (*See id.*; Defs.' & Pl.'s 56.1 ¶ 43.) This was the first time that Aouatif had ever called him on his cell phone.[2] (*See* Defs.' & Pl.'s 56.1 ¶ 44.) According to Aouatif's account of the conversation, Kotbi told her that she had signed a release for him to call the lawyer, whereupon Aouatif explained that she only authorized Kotbi to send medical records to the lawyer – not to speak to her. (*See* Aouatif Aff. ¶ 10.) Aouatif stated that Kotbi then began laughing at her and mocking her, (*see id.*), and that he indicated he was going to call 911 to have her taken to the hospital for an emergency evaluation. (*See* Defs.' & Pl.'s 56.1 ¶¶ 45, 47.) Aouatif admits that she raised her voice at Kotbi, characterizing herself as "mad." (*See* Aouatif Dep. at 106.) She told Kotbi that he had no right to call 911, threatened to sue him if he did so, (*see* Defs.' & Pl.'s 56.1 ¶ 48), and accused Kotbi of making improper

---

[2] At some point during treatment, Kotbi gave Aouatif his cell phone number, although the parties do not agree on his reason for doing so. (*See* Defs.' & Pl.'s 56.1 ¶ 42.)

sexual comments during therapy sessions and of spreading false rumors about her and her roommate being gay, (*see* Aouatif Dep. at 107–08; Kotbi Dep. at 25).[3]  The conversation lasted between 15 and 20 minutes, at which point Aouatif hung up on Dr. Kotbi.  (*See* Aouatif Dep. at 105, 112; Aouatif Aff. ¶ 11.)

    Dr. Kotbi's account of the phone call largely coincides with Aouatif's, although he testified that he felt she was delusional and was saying "things that were irrational."  (Kotbi Dep. at 33–34.)  Kotbi stated that in the past, Aouatif had expressed the belief that "there was a conspiracy against her," (*id*. at 34), and that on the phone, she accused him of spreading lies and rumors, including "telling the Moroccan community in Queens that she was a lesbian."  (*Id*. at 25.)  Kotbi believed Aouatif was possibly hallucinating, (*id*. at 26, 34), as she continuously told him to stop laughing at her when he was not, (*id*. at 26, 28).  He testified that Aouatif "sounded psychotic," was "screaming on the phone," and acting "absolutely different than . . . how she acted in [his] office in almost a year of therapy."  (*Id*. at 25, 28.)  Kotbi became concerned with "the intensity of the paranoia"; Aouatif's display of anger and "pressured" speech was out of keeping with her typical soft-spoken demeanor, and she was acting in a "very, very unusual" manner.  (*Id*. at 25, 60.)  Worried that Aouatif was experiencing a psychotic episode and fearing that she posed a "very high risk for danger," (*id*. at 34), Kotbi asked Aouatif whether she felt like hurting herself or anyone else, (*see id*. at 28).  Kotbi stated that Aouatif did not directly answer him, instead telling him to stop laughing at her.  (*See id*.)  From Kotbi's observation of Aouatif on the phone, he detected a "change in [her] mental status," felt she had "poor judgment" at the time, and that she "needed to be evaluated" because "her judgment put[] her at a high risk for danger to [her]self or others[,]" whether willingly or unwillingly."  (*Id*. at 27–29.)  Kotbi believed

---

[3] While Aouatif's testimony is contradictory at points, she stated, "[Kotbi] [t]old me I am lesbian and he accusing people he's gay," and also stated, "He asked me if I'm lesbian."  (Aouatif Dep. at 107–08.)

she might be "having a psychotic decompensation" or a "complex partial seizure," among other possibilities.  (*Id.* at 26.)  He explained that when patients in "psychotic decompensation . . . feel the world is a threat," they may "do something that results in danger to the patient or to others." (*Id.* at 29.)  Kotbi pleaded with Aouatif to go to the hospital for an emergency evaluation, which she refused.  (*See id.* at 26.)  Kotbi testified that this was an emergency situation, (*id.* at 33), and that he felt "it was [his] duty to protect her from any harm that would be the result of her psychiatric illness" by having her "further assessed to make sure she [was] safe."  (*Id.* at 36, 51.)

After Aouatif hung up the phone on Kotbi, he called 911 and requested that she be transported to Kings County Hospital.  (*See* 911 Tr., Ex. A to Defs.' Mot. (Doc. No. 56-2) at 2.) Kotbi testified that he expected hospital personnel to evaluate Aouatif, but that they were free to disagree with his assessment and discharge her without treatment if they found she was stable. (*See* Kotbi Dep. at 51.)  The transcript of the 911 call reflects that Kotbi reported that Aouatif was "talking out of her head."  (911 Tr. at 2.)  Shortly thereafter, at 1:50 pm, two police officers arrived at Aouatif's apartment while she was taking a shower, and Aouatif's roommate permitted the officers to enter.  (*See* Defs.' & Pl.'s 56.1 ¶ 54; Anderson Decl. (Doc. No. 54) ¶ 20.)  Aouatif, after exiting the shower and wearing only a towel, explained to the officers that her doctor had called 911 in retaliation for her accusing him of improperly speaking with her lawyer.  (*See* Aouatif Dep. at 118–119.)  She then went into her bedroom to dress while the officers – still in her apartment – called Dr. Kotbi.  (*See* id. at 120.)  When Aouatif emerged, the officers informed her that Kotbi wanted her taken for an emergency evaluation and indicated that they were going to take her to the hospital, but that the hospital would release her after the evaluation.  (*See id.* at 121, 125–126, 131.)  Aouatif does not suggest that the officers handcuffed her, and she perceived them as "nice" and "understanding."  (Defs.' & Pl.'s 56.1 ¶ 58.)  Not wanting to see Kotbi,

Aouatif suggested that she be taken to Brookdale Hospital instead of Kings County, and the officers agreed to this request.  (*See id*. ¶¶ 56–57.)  An ambulance and two Emergency Medical Technicians ("EMTs") arrived at Aouatif's apartment at 2:02 pm, and transported her to Brookdale.  (*See id*. ¶¶ 61–62.)  Aouatif had no further contact with the police officers; they did not accompany her in the ambulance or to the hospital.  (*See id*. ¶¶ 82–83.)

One of the EMTs created a Prehospital Care Report ("PCR"), in which he wrote that Aouatif complained of "feeling very depress [*sic*] for the past few days, because of her school situation . . . she wants to talk to somebody," and recorded the presumptive diagnosis as "EDP," which means "emotionally disturbed person."  (*See* PCR, Ex. B to Defs.' Mot. (Doc. No. 56-3) at 3; Defs.' & Pl.'s 56.1 ¶¶ 64, 65.)  Aouatif also testified:  "[The paramedic] asked me if I go to psychiatric [*sic*].  I say 'Yes.' . . . [for] Depression."  (Aouatif Dep. at 137.)  Aouatif disputes the accuracy of the PCR; she says that she told the EMT that she had started therapy due to depression, but that she was not depressed at the time.  (*See* Aouatif Dep. at 138; Defs.' & Pl.'s 56.1 ¶ 66.)

Records from the Emergency Department at Brookdale describe Aouatif's depression as "becoming worse."  (Brookdale Emergency Department, Ex. O to Defs.' Mot. (Doc. No. 56-16) at 3.)  A form documenting Aouatif's initial assessment at Brookdale reflects that she reported that she "started feeling depressed" in 2001 when she "lost everything and was kicked out of school."  (Brookdale Initial Assessment, Ex. 10 to Pl.'s Mot. (Doc. No. 59-11) at 8.)  The form also states:  "[Patient] denied any suicidal and homicidal ideation.  Patient complained of body ache.  Patient seemed to be sexually preoccupied with her psychiatrist.  Patient is unable to give her psychiatrist['s] number."  (*Id*.)  Brookdale personnel then conducted a mental status examination and found that she was having "paranoid" and possibly "erotomanic" delusions.

7

(*Id.* at 15; *see also id.* at 17 (noting diagnosis of "delusional").)  The record reflects that at least three Brookdale personnel, including an attending doctor, participated in the initial assessment. (*See id.* at 18.)  As a result of their own independent observations and examinations, Brookdale doctors diagnosed Aouatif with "borderline personality," (*id.* at 17), and determined that she was delusional and manifested symptoms of depression and anxiety.  (*See* Brookdale Initial Treatment Plan, Ex. O to Defs.' Mot. at 17.)  Aouatif was prescribed Risperidone, an anti-psychotic drug, and Trileptal.[4]  (*See* Defs.' & Pl.'s 56.1 ¶ 87.)  The doctors recommended that Aouatif be held for observation and reevaluation.  (*See* Brookdale Initial Assessment at 18.)  She was subsequently admitted to Brookdale over her repeated protests, (Aouatif Aff. ¶¶ 16–17), and was held for observation for approximately 46 hours.  (*See* Defs.' & Pl.'s 56.1 ¶ 96.)

Later examination notes from Brookdale reference Aouatif's apparent "delusional disorder," (Brookdale Continuing Notes, Ex. O to Defs.' Mot. at 22); state that her "[i]nsight/judgment" was "impaired," (Brookdale Continuation Record, Ex. O to Defs.' Mot. at 24); and characterize her as "unstable and angry at times," "paranoid," "grandiose," and "agitated and argumentative."  (*Id.* at 25–26.)  These records also reflect that Aouatif reported "feeling depressed."  (*Id.* at 25.)  Upon her discharge, Aouatif was provided mobile crisis support, (*see* Defs.' & Pl.'s 56.1 ¶ 96), which Kotbi described as a type of assisted outpatient treatment, (*see* Kotbi Dep. at 44).  When Aouatif left the psychiatric unit, she went immediately to a previously scheduled therapy session with her regular Brookdale psychologist, at that time a Dr. Hosttler.  (*See* Defs.' & Pl.'s 56.1 ¶ 97.)

---

[4] Risperidone is used to treat schizophrenia, bipolar disorder, or irritability associated with autistic disorder, and Trileptal is used to treat partial seizures.  *See* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/risperidone-oral-route/description/drg-20067189 (last visited May 29, 2019); *see also* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/oxcarbazepine-oral-route/description/drg-20067615 (last visited May 29, 2019).

Aouatif visited Kotbi the following day to ask that he send her medical records to her lawyer and to seek an apology from him.  (*See* Aouatif Aff. ¶¶ 19–20.)  Aouatif alleges that Kotbi became upset and "said he would call security to have [her] locked up again."  (*Id*. ¶ 20.) She learned from Kotbi that she had been discharged from her program at Kings County and was not referred elsewhere for treatment.  (*Id*.)  Aouatif alleges that Kotbi and Dr. Page Burkholder, Medical Director of Outpatient Psychiatry for Adults at Kings County and Kotbi's supervisor on June 11, 2005, discharged her from treatment in retaliation.  (*See* Pl. Supp. Br. (Doc. No. 66) at 6–9.)

Kotbi describes the visit differently.  He states that Aouatif came to his office after her discharge, "still raving," "very angry," and "in an adversarial mood."  (Kotbi Dep. at 77–78.)  He informed her that she was being discharged as his patient and that she had other care set up.  (*Id*.) He asked Aouatif to leave, as he felt the situation was "still volatile," and when she failed to do so, he indicated that he would contact hospital police.  (*Id*.)

Dr. Burkholder testified that Kotbi sought her advice on how to manage Aouatif's care, and that a decision was made to close Aouatif's care at Kings County and continue care only at Brookdale, where Aouatif was also receiving treatment.  (*See* Burkholder Dep., Ex. M. to Defs.' Mot. at (Doc. No. 56-14) at 9–10.)  Dr. Burkholder testified that patients generally receive better care when they are treated at one facility.  (*See id*. at 15.)

## II.    The Second Amended Complaint

The operative complaint asserts a single cause of action pursuant to 42 U.S.C. §§ 1983 and 1985 against Dr. Kotbi, the City of New York, HHC, and John Does 1–10 for violations of Aouatif's Fourth, Eighth, and Fourteenth Amendment rights, and conspiracy to violate such rights.  (*See* Second Am. Compl. ("SAC") (Doc. No. 22).)  Aouatif contends that she was falsely

arrested by the John Doe police officers because they detained and "imprison[ed]" her without a warrant and without probable cause.  (*See* SAC at 3, ¶ 6; 4, ¶ 16.)  She argues that her transport to Brookdale was not voluntary.  (*See* Pl. Mot. (Doc. No. 60) at 10.)  Notably Aouatif alleges that on the one hand, she was not depressed or otherwise mentally ill at the time, and on the other hand, that she was unable to consent because mentally ill individuals cannot give informed consent.  (*See id*. at 18.)  Aouatif also states that the officers conspired to deprive her of her constitutional rights.  (*See* SAC at 4, ¶ 17.)

Next, Aouatif argues that Dr. Kotbi violated her constitutional rights when he directed the police to falsely detain and imprison her.  In her brief, she states that Kotbi "invoke[ed] state power to have her detained," without probable cause and without a "careful examination."  (Pl. Mot. at 16, 19.)  In her brief, she also purports to bring a "malicious abuse of process" claim against Kotbi, arguing that he retaliated against her "for confronting him over his various unlawful and unethical acts."  (*Id*. at 26.)  However, the only mention of this claim in the second amended complaint is a statement that defendants acted "in abuse of their powers" and deprived Aouatif of her right to be free from "abuse of process."  (*See* SAC at 3, ¶ 11; 4, ¶ 18.)

The sole allegation in the second amended complaint against HHC is that HHC was the employer of Dr. Kotbi.  (*See id*. at 2, ¶ 11.)  However, in her brief, Aouatif presents additional arguments related to her discharge as a patient, discussed further *infra*.  With respect to the City of New York ("the City"), Aouatif alleges that the City acted with deliberate indifference for failing to discipline the John Doe officers.  (*See* SAC at 3, ¶ 9.)  Finally, Aouatif makes the general allegation that "defendants" deprived her of the rights "to be free from the excessive use of force and from malicious prosecution," without any further elaboration.  (*Id*. at 3, ¶ 11.)

Defendants moved for summary judgment, arguing, *inter alia*, that neither Dr. Kotbi nor the officers violated Aouatif's constitutional rights, as she went to the hospital voluntarily. (*See* Defs.' Mot. (Doc. Nos. 56, 57) at 12, 21.) They allege that even if defendants did violate Aouatif's rights, involuntary hospitalization was warranted and moreover, they are entitled to qualified immunity, as it was reasonable to believe that she posed a serious risk of harm to herself or others. (*See id*. at 19–20, 25.) Defendants also argue that Aouatif cannot establish a due process violation without producing expert evidence to demonstrate that Dr. Kotbi's conduct fell substantially below community medical standards. (*See id*. at 21.) Defendants contend that the City cannot be liable because no officer committed a constitutional violation. (*See id*. at 20.) Finally, they argue that Aouatif has not articulated any basis for municipal liability with respect to the City or HHC. (*See id*. at 20, 26.)

## LEGAL STANDARDS

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come

forward with 'specific facts showing that there is a genuine issue for trial,'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.  Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case."  *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case."  *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

To prevail on her Section 1983 claims, Aouatif must show (1) that defendants acted under color of state law, and (2) that they deprived her of a right, privilege or immunity secured by the Constitution and laws of the United States.  *See* 42 U.S.C. § 1983; *see also Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).  A Section 1983 action based on involuntary civil commitment for a psychiatric evaluation implicates both the Fourth Amendment's prohibition on unreasonable seizures and the Fourteenth Amendment's Due Process Clause.  *See Mittelman v. Cty. of Rockland*, No. 07-CV-6382 (CM) (LMS), 2013 WL 1248623, at *23 (S.D.N.Y. Mar. 26, 2013) (citing *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995); *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993)).  Here, Aouatif alleges that the June 11, 2005, incident involved violations of her rights under both the Fourth and Fourteenth Amendments.[5]

---

[5] Aouatif's SAC also alleges an Eighth Amendment violation, but the Court deems it abandoned because she has not addressed the merits of this claim in any of her motion papers.  *See Folk v. City of New York*, 243 F. Supp. 3d 363,

## DISCUSSION

### I.      Claims Against Dr. Kotbi[6]

Aouatif alleges that Dr. Kotbi violated her rights under the Fourth and Fourteenth Amendments by calling 911 and requesting that officers take her to the hospital for an emergency psychiatric evaluation, despite the fact that she did not meet the standards for involuntary transport for mental health treatment.[7]  Dr. Kotbi argues that (1) Aouatif consented to transport to the hospital; (2) in any event, Aouatif met the standard for involuntary transport; and (3) he is entitled to qualified immunity.

Because it is undisputed that Dr. Kotbi was employed by HHC – a state municipal corporation – and was acting pursuant to his authority as Aouatif's treating psychiatrist when he

---

375 (E.D.N.Y. 2017).  In any event, the claim is meritless because the Eighth Amendment applies only to persons convicted of crimes, and Aouatif has presented no evidence that she was convicted of a crime.  *See Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 288–89 (E.D.N.Y. 2010).

[6] Even assuming that Dr. Kotbi has been sued in both his individual and official capacities, any damages suit against a state employee acting in his official capacity is deemed a suit against the state itself, and is therefore barred by the Eleventh Amendment.  *See Thomas v. Calero*, 824 F. Supp. 2d 488, 498 (S.D.N.Y. 2011) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–102 (1984)).  The Court therefore analyzes Aouatif's claim against Dr. Kotbi as an individual-capacity claim.

[7] Aouatif argues at length that Kotbi violated her rights because he failed to comply with the provisions of the New York Mental Hygiene Law ("MHL"), which establishes standards for involuntary admission to and treatment in mental health facilities, among other things.  *See, e.g.*, N.Y. MHL § 9.55 ("Emergency admissions for immediate observation, care and treatment; powers of psychiatrists").  "Although the Second Circuit Court of Appeals has found compliance with the MHL *sufficient* to meet the requirements of due process, s*ee Project Release v. Prevost*, 722 F.2d 960, 973–74 (2d Cir. 1983), it has never found that compliance with the MHL is a *necessary* condition to guaranteeing due process."  *Algarin v. New York City Dep't of Corr.*, 460 F. Supp. 2d 469, 475 (S.D.N.Y. 2006) (alteration in original) (holding that due process standards, not the MHL, govern plaintiff's due process claim, and concluding that "the fact that neither [doctor defendant] may have met the technical requirements of the MHL does not, *per se*, make out a due process claim against them, and summary judgment may therefore not be granted against them on that basis", *aff'd*, 267 F. App'x 24 (2d Cir. 2008).  Similarly, the MHL does not set out the standard for whether a mental health seizure was reasonable under the Fourth Amendment.  *See Anthony v. City of New York* ("*Anthony II*"), 339 F.3d 129, 137 (2d Cir. 2003) (noting that the reasonableness of a warrantless seizure for the purpose of involuntary hospitalization is determined under the Fourth Amendment probable cause standard).  Moreover, Aouatif has not stated a claim for relief pursuant to the MHL, but uses the MHL only to argue that Kotbi violated her constitutional rights.  Therefore, because the Court finds that Kotbi did not violate Aouatif's rights under constitutional standards, as described *infra*, it is not necessary to determine whether Kotbi complied with the technical requirements of the MHL.

called 911, the Court assumes that Dr. Kotbi was acting under color of state law when he made

the 911 call.  *See Tewksbury v. Dowling*, 169 F. Supp. 2d 103, 110 (E.D.N.Y. 2001) (psychiatrist

employed by the state was "unquestionably a state actor" for purposes of Section 1983);

*Capellupo v. Nassau Health Care Corp.*, No. 06-CV-4922 (JFB) (ETB), 2009 WL 1705749, at

*6 (E.D.N.Y. June 16, 2009) (holding that doctor employees of a public benefit corporation were

state actors for purposes of a Section 1983 claim).  The remaining question is therefore whether

the undisputed facts, taken in the light most favorable to Aouatif, establish that Kotbi violated

Aouatif's Fourth or Fourteenth Amendment rights on June 11, 2005.  The Court finds that they

do not.

### A.  Whether Aouatif's Transport Was Involuntary

As a preliminary matter, there may, indeed, be a genuine issue of fact as to whether

Aouatif consented to her transport to the hospital.  It is undisputed that Aouatif was not

handcuffed, that the officers treated her well, and that Aouatif herself suggested which hospital

she should go to.  Still, none of this necessarily establishes that the transport was voluntary or

that she was not arrested; the officers indicated that Aouatif was required to go to the hospital,

and thus, a reasonable jury could find that her cooperative attitude resulted from her realization

that she was detained and the officers were not going to leave without her.  Indeed, Aouatif

alleges that she requested to go to Brookdale because at that point, "[t]he question . . . was not

whether she would be held against her will, but merely where."  (Pl. Mot. at 11.)  In *Mizrahi v.

City of New York*, Judge Ross confronted the same issue, as plaintiff there cooperated with

officers and asked to be taken to a different hospital.  *See* No. 15-CV-6084 (ARR) (LB), 2018

WL 3848917, at *18 (E.D.N.Y. Aug. 13, 2018).  Judge Ross found that a reasonable jury could

conclude that plaintiff's cooperation did not establish her consent to being transported to the

hospital, but "merely demonstrate[d] acquiescence" to the "perceived authority" of the officers. *Id.*; *see also Seifert v. Rivera*, 933 F. Supp. 2d 307, 317 (D. Conn. 2013) ("[M]ere silence or the failure to object . . . does not constitute consent unless the totality of circumstances so indicates." (quoting *United States v. Taylor*, 279 F. Supp. 2d 242, 245 (S.D.N.Y. 2003))).

However, distinct from *Mizrahi*, whether or not the transport was voluntary is ultimately immaterial to this Court's conclusion. Here, even if Aouatif *was* involuntarily transported, Dr. Kotbi did not violate her constitutional rights, for the reasons discussed below.

### B. Fourteenth Amendment Due Process Claim

"The Second Circuit has recognized that an involuntary civil commitment is a massive curtailment of liberty." *Kraft v. City of New York*, 696 F. Supp. 2d 403, 412 (S.D.N.Y. 2010) (quoting *Rodriguez*, 72 F.3d at 1061) (internal quotation marks omitted), *aff'd* 441 F. App'x 24 (2d Cir. 2011). Due process therefore does not permit involuntary hospitalization of a person unless that person poses a risk of serious harm either to herself or to others. *See id.* (citing *Rodriguez*, 72 F.3d at 1061); *see also Algarin*, 460 F. Supp. 2d at 475 (citing *O'Connor v. Donaldson*, 422 U.S. 563, 575, 580–81 (1975)).

Due process does not, however, "require a guarantee that a physician's assessment of the likelihood of serious harm be correct." *Kraft*, 696 F. Supp. 2d at 412 (quoting *Rodriguez*, 72 F.3d at 1061). Rather, "[t]he Second Circuit has instructed that 'a doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'" *Id.* (quoting *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996)); *see also Brock v. City of New York*, No. 15-CV-1832 (VSB), 2018 WL 3579099, at *9 (S.D.N.Y. July 25, 2018); *Bender v. Lowe*, No. 8-CV-334 (BSJ), 2011 WL

4001147, at *7 (S.D.N.Y. Aug. 31, 2011) (decision to involuntarily commit a mentally ill person will not violate due process unless it is based on criteria "substantially below the standards generally accepted in the medical community" (quoting *Bolmer v. Oliveira*, 594 F.3d 134, 143 (2d Cir. 2010)), *aff'd* 531 F. App'x 142 (2d Cir. 2013).

Such decisions do not "ordinarily involve matters within the layman's realm of knowledge," but rather "turn[] on the meaning of the facts which typically must be interpreted by expert psychiatrists and psychologists." *Fisk v. Letterman*, 501 F. Supp. 2d 505, 522 (S.D.N.Y. 2007) (quoting *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 190–91 (2d Cir. 2005)); *see also Mittelman*, 2013 WL 1248623, at *24. Therefore, "plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards." *Kraft*, 696 F. Supp. 2d at 413 (quoting *Fisk*, 501 F. Supp. 2d at 522). In the absence of such evidence, summary judgment is appropriate. *See id.*; *Brock*, 2018 WL 3579099, at *11 (recognizing that "courts in this Circuit routinely dismiss 'claims on summary judgment where the plaintiff's expert fails to identify the standard of care which was allegedly violated'" (quoting *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 535 (S.D.N.Y. 2015) (collecting cases))).

Here, it cannot be said that Kotbi violated Aouatif's right to due process by admitting her to Brookdale because he did not have admitting privileges at that hospital.[8] *See Fisk*, 501 F. Supp. 2d at 521–22 (doctors who did not participate in the involuntary admission decision, or the decision to keep plaintiff hospitalized did not violate her due process rights).[9] Aouatif argues

---

[8] Aouatif does not appear to dispute this fact. (*See* Kotbi Dep. at 31–32 ("Q. Did you admit Zerrad into Brookdale? A. No, I did not. I don't have admission privilege[s] to Brookdale. I'm not an admitting physician at Brookdale.").)

[9] Aouatif does not challenge the Brookdale doctors' decision to admit her involuntarily to the hospital, nor could she under Section 1983 because those doctors are privately employed and thus are not state actors. *See Johnson v. Unity Health Sys.*, No. 08–CV–6258, 2010 WL 1404123, at *3 (W.D.N.Y. Mar. 30, 2010).

instead that Kotbi convinced Brookdale doctors to have her committed by providing false information.  In *Heller v. Bedford Central School District*, plaintiff similarly alleged that a police officer furnished "inflammatory and false information" to a hospital to procure his involuntary commitment.  144 F. Supp. 3d 596, 607–08 (S.D.N.Y. 2015).  There, the Court disposed of plaintiff's accusations by finding that the seizure was "privileged and reasonable," given the "medical staff's independent determination" that involuntary commitment was necessary.  *Id*. at 623–25.  Here, too, the decision to admit Aouatif was based the independent judgment of Brookdale doctors..  While the medical records indicate that Kotbi paged Brookdale on June 11, 2015, (*see* Brookdale Initial Assessment at 16), the record also reflects that multiple doctors at Brookdale conducted independent assessments of Aouatif.  There is nothing in the record to suggest that those doctors relied solely on Kotbi's phone call in deciding to admit Aouatif.  *See also Fisk*, 401 F. Supp. 2d at 377–78 (Where plaintiff alleged that someone provided false information in order to influence doctors' decision to involuntarily commit her, the court found that doctors determined on their own that she should be committed, and that there were "no facts from which it could be inferred that [the] process was subverted" or that the doctors "substituted [anyone's] judgment for their own.")

Indeed, after conducting an examination of Aouatif, the Brookdale doctors determined, based on their personal observations, that Aouatif was having "paranoid" and possibly "erotomanic" delusions; diagnosed her with borderline personality; and recommended that she be held for observation and reevaluation.  (Brookdale Initial Assessment at 15, 17–18.) Examination notes report Aouatif as "unstable and angry at times," "grandiose," and "agitated and argumentative," (Brookdale Continuation Record at 25), and state that her judgment was impaired, (*id*. at 24).  Although Aouatif disavows the medical records that report her depression,

17

her naked assertion that these records are inaccurate is inconsistent with her undisputed receipt of disability benefits based on her depression, (*see* Defs.' & Pl.'s 56.1 ¶ 6), and her own statements. While Aouatif denies telling the EMTs that she was depressed despite records indicating otherwise, (*see* PCR at 3 (noting patient's complaint of "feeling very depress")), Brookdale records created only hours later corroborate the PCR, (*see* Brookdale Continuation Record at 25 (noting that Aouatif reported "feeling depressed"); Brookdale Initial Treatment Plan at 17 (noting that she exhibited symptoms of depression)).  Moreover, such a blanket denial of the accuracy of medical records is untenable; as stated in *Kulak*, "bare denials of statements allegedly made by patients under such circumstances [are not] enough to defeat summary judgment."  88 F.3d at 76; *see also Katzman v. Khan*, 67 F. Supp. 2d 103, 111 (E.D.N.Y. 1999) (plaintiff's "blanket denials of his bizarre behavior and bald assertions that his examining doctors fabricated their observations" were insufficient to defeat summary judgment), *aff'd* 242 F.3d 365 (2d Cir. 2000).  The PCR and Brookdale hospital records, created contemporaneously by trained medical professionals, bely Aouatif's bald claims that she was only held at Brookdale because of Kotbi's misdeeds.

Thus, because Kotbi did not have admitting privileges to Brookdale, and because the undisputed record shows that it was the Brookdale doctors' own professional judgment that caused Aouatif's involuntary commitment, the only viable basis for Kotbi's liability is that he caused Aouatif's involuntarily *transport* to Brookdale.  At least one court in this Circuit has held that "[t]he act of transporting someone to a hospital against her will to be committed, as distinct from the commitment itself, is properly analyzed only as a Fourth Amendment violation," and not as a Fourteenth Amendment violation.  *Eze v. City Univ. of New York at Brooklyn College*, No. 11-CV-2454 (JG) (CLP), 2011 WL 6780652, at *3 (E.D.N.Y. Dec. 27, 2011) (citing *Green*

18

*v. City of New York*, 465 F.3d 65, 85 (2d Cir. 2006)); *see also Heller*, 144 F. Supp. 3d at 625 (noting that plaintiff's involuntary commitment claim "sounds in the Fourth Amendment," which "provides an explicit textual source of constitutional protection against the particular sort of behavior at issue" (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994))), *aff'd* 665 F. App'x 49 (2d Cir. 2016).  Accordingly, summary judgment may be granted with respect to Aouatif's claim that Kotbi violated her Fourteenth Amendment due process rights.

However, even if the Court were to evaluate Aouatif's alleged involuntary transport under due process principles, summary judgment would be warranted.  The record contains no evidence or expert testimony setting forth the accepted medical standards with respect to involuntary hospital admission or how Dr. Kotbi failed to satisfy such standards, as is required to show a due process violation in this context.  *See Olivier*, 398 F.3d at 190–91; *Kulak*, 88 F.3d at 75–76.  In an effort to defeat summary judgment, Aouatif has produced a two-page report memorializing a psychological consultation conducted by Dr. Jeffrey Rubin in September 2008, but this report is insufficient to satisfy Aouatif's burden because it neither identifies the accepted medical standards nor concludes that Dr. Kotbi's actions fell substantially below such standards. The report describes Dr. Rubin's observations of Aouatif in 2008, noting that her "insight and judgment were intact"; she did not complain of suicidal feelings; and she "presented no signs and symptoms of being a danger to herself or others."  (*See* Dr. Rubin Report, Ex. 12 to Pl.'s Mot. (Doc. No. 59-13) at 1–2.)  However, Dr. Rubin's conclusions about Aouatif in 2008 are simply irrelevant to whether Dr. Kotbi acted in accordance with accepted medical standards three years earlier in 2005.  *See Kulak*, 88 F.3d at 75 (expert's report was inadequate because it did not assert that the treating doctor's diagnosis fell substantially below accepted professional judgment).  Thus, in addition to the fact that Kotbi had no admitting privileges at Brookdale, the

absence of any evidence setting forth accepted medical standards provided a further basis upon which this Court grants summary judgment in Kotbi's favor with respect to Aouatif's Fourteenth Amendment claim.

### C.  Fourth Amendment Claim

The Fourth Amendment protects against unreasonable searches and seizures "whether the seizure is for purposes of law enforcement or due to an individual's mental illness." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016); *see also Mizrahi*, 2018 WL 3848917 at *18.  Courts have found that involuntary confinement to a hospital is "tantamount to the infringement of being arrested," and thus amounts to a seizure within the meaning of the Fourth Amendment. *Glass*, 984 F.2d at 58 (citation omitted); *see also Kraft*, 696 F. Supp. 2d at 415; *Brock*, 2018 WL 3579099 at *9.  Involuntary transport to a hospital may also constitute a seizure for purposes of the Fourth Amendment.  *See Eze*, 2011 WL 6780652, at *5 (citing *Green*, 465 F.3d at 83).  Such a seizure does not violate the Fourth Amendment, however, if there is probable cause for it, meaning that there existed "'reasonable grounds for believing that the person seized' is dangerous to herself or to others."  *Anthony v. City of New York* (*"Anthony II"*), 339 F.3d 129, 137 (quoting *Glass*, 984 F.2d at 58).  "For a mental health seizure," the law requires only "a probability or substantial chance of dangerous behavior, not an actual showing of such behavior."  *Heller*, 144 F. Supp. 3d at 622 (internal quotation marks omitted) (citation omitted). To determine whether probable cause existed to justify a mental health seizure, courts must look to "the specific observations and information available" at the time of the seizure.  *Myers*, 819 F.3d at 633; *see also Mizrahi*, 2018 WL 3848917, at *20.

Here, it was objectively reasonable for Kotbi to conclude that involuntary transport to the hospital was warranted.  Given Aouatif's agitated demeanor on the phone, Kotbi's prior

20

diagnoses of Aouatif, and his belief that she had attempted suicide in the past, Kotbi had probable cause to believe that Aouatif posed a risk of harm to herself or others when he called 911.

Aouatif does not dispute that she placed an angry call to Kotbi on a Saturday, and she admits that she raised her voice on the phone.  (*See* Aouatif Dep. at 106.)  Although her anger could be interpreted as mere distress that Kotbi spoke to her lawyer without her permission, it was reasonable for Kotbi, drawing on his knowledge of Aouatif's mental health, to fear that her anger created the potential for her to harm herself or someone else, particularly given his belief that she attempted suicide in the past.  *See also Hunter v. Bryant*, 502 U.S. 224, 228 (1991) ("[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.").  Aouatif was not receptive to Kotbi's expressions of concern:  When Kotbi asked her whether she felt like hurting herself or others, she did not answer the question.  When Kotbi indicated that he wanted Aouatif to go to the hospital for a psychiatric evaluation, she threatened to sue him, and then hung up on him.  Although Aouatif argues that Kotbi did not perform an adequate examination before ordering her transport to the hospital, it was Aouatif who cut off the conversation by hanging up on Kotbi, leaving him little choice but to feel concern that she was unstable.

Additionally, the phone call must be viewed in the context of several months of weekly one-on-one treatment sessions between Aouatif and Kotbi, in which Kotbi became familiar with Aouatif's mental state, demeanor, and psychiatric conditions.  Kotbi testified at his deposition that in some cases, people suffering from psychotic decompensation "are so distressed inside and overwhelmed by bad thoughts that they don't see where they walk and they can get hit by cars,"

21

or "go to campus and kill everyone around." (Kotbi Dep. at 33–34.) Against this background and based on her conduct on the phone, it was reasonable for Kotbi to conclude that Aouatif posed a risk of harm to herself or others.

Aouatif argues that she did not pose a risk of harm to herself or others, emphasizing that she displayed no violent behavior. The Fourth Amendment, however, requires only a "probability or substantial chance of dangerous behavior, not an actual showing of such behavior" to support a seizure for involuntary transport. *Brown v. Catania*, No. 3:06-CV-73 (PCD), 2007 WL 879081, at *5 (D. Conn. Mar. 21, 2007) (quoting *Waananen v. Barry*, 343 F. Supp. 2d 161, 170 (D. Conn. 2004)); *cf. Fisk*, 501 F. Supp. 2d at 524 (holding that due process does not require a "recent overt act" demonstrating dangerousness "as a prerequisite for involuntary commitment" (quoting *Rodriguez*, 72 F.3d at 1062)). It was reasonable for Kotbi to conclude that Aouatif exhibited a "probability or substantial chance" of dangerous behavior, in light of her mental conditions, even absent explicitly violent behavior. *See Anthony v. City of New York ("Anthony I")*, No. 00-CV-4688 (DLC), 2001 WL 741743, at *5 (S.D.N.Y. July 2, 2001) (holding that officers had probable cause to seize a woman who suffered from Down's Syndrome for involuntary hospitalization even though she was behaving calmly), *aff'd*, 339 F.3d 129 (2d Cir. 2003). Moreover, the Brookdale records indicating that Aouatif was not violent – made later in the day by doctors who did not have experience treating her – do not speak to the reasonableness of Kotbi's concern that she posed a risk of harm when he called 911 earlier in the day. *See Waananen*, 343 F. Supp. 2d at 170 (Although a later hospital evaluation showed that plaintiff was not a danger to himself or others, the facts available to defendants at the time showed the existence of probable cause.). If anything, the Brookdale records substantiate Kotbi's determination. The Brookdale examination notes state that Aouatif had impaired

22

judgment; that she was delusional, grandiose, agitated, and argumentative; and that the doctors

there, based on their own observations, determined that she should be held for 46 hours.  *See*

*Fisk*, 501 F. Supp. 2d at 522–23 (doctors had probable cause to involuntarily commit plaintiff

based, in part, on her "aggressive, belligerent, hostile, [and] persistent" behavior); *Drozdik v.*

*City of New York*, No. 01-CV-3300 (RCC) (GWG), 2003 WL 366639, at *4 (S.D.N.Y. Feb. 20,

2003) (doctors had probable cause to involuntarily commit plaintiff based, in part, on their

medical judgment that she posed a risk of danger, as she appeared "schizophrenic, psychotic,

paranoid" and "delusional").

### a.  Qualified Immunity

Qualified immunity may serve as an alternative basis for granting summary judgment in

Dr. Kotbi's favor.  The doctrine of qualified immunity protects public officials from liability for

violating clearly established constitutional rights, so long as it was objectively reasonable for the

official to believe that his conduct did not violate such rights.  *See Katzman*, 67 F. Supp. 2d at

109; *Brown*, 2007 WL 879081, at *6 (citing *Anderson v. Creighton*, 483 U.S. 635, 638–39

(1987)).  Qualified immunity is a two-step inquiry:  first, the Court examines whether the

official's conduct violated a clearly established constitutional right; second, even if the official

did violate such a right, he "is still entitled to qualified immunity if it was objectively reasonable

for him to believe that his conduct did not violate [that right]."  *Brown*, 2007 WL 879081, at *6

(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Anderson*, 483 U.S. at 638–39).  "To be

deprived of the defense of qualified immunity, a public official must not simply violate

plaintiff's rights; rather, the violation of plaintiff's rights must be so clear that no reasonable

public official could have believed that his actions did not violate such rights."  *Stanley v.*

*Cooper*, 996 F. Supp. 316, 320–21 (S.D.N.Y. 1998) (citing *Anderson*, 483 U.S. at 640); *see also*

*Birmingham v. Ogden*, 70 F. Supp. 2d 353, 375 (S.D.N.Y. 1999) ("[W]here the law is clearly settled, summary judgment may be granted on qualified immunity grounds if the *only* conclusion a rational jury could reach is that reasonable officials would disagree about the legality of the defendants['] conduct under the circumstances." (internal brackets omitted) (internal quotation marks omitted) (citation omitted)).

In the context of involuntary transport to the hospital, the availability of qualified immunity turns on whether, at the time Dr. Kotbi called 911 and in light of the information he then possessed, it was objectively reasonable for him to believe that Aouatif posed a risk of serious harm to herself or others. *See Rodriguez*, 72 F.3d at 1065; *Sumay v. City of New York Health & Hosp. Corp.*, No. 97-CV-3606 (SS), 1998 WL 205345, at *6 (S.D.N.Y. Apr. 28, 1998). Even assuming that his determination was incorrect, qualified immunity shields him from liability unless his determination was "plainly incompetent" or amounted to a knowing violation of the law. *See Hunter*, 502 U.S. at 229 ("The qualified immunity standard 'gives ample room for mistaken judgments' . . . ." (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).

Here, there is no evidence in the record that Kotbi was plainly incompetent or knowingly violated the law. Kotbi did not violate Aouatif's Fourth Amendment rights, but even if the Court assumes he did, any violation was not so clear that "no reasonable public official could have believed that [Kotbi's] actions did not violate such rights." *Stanley*, 996 F. Supp. at 320; *see also Anthony I*, 2001 WL 741743, at *6 (officers were entitled to qualified immunity with respect to involuntary transport of plaintiff because, although she behaved calmly when officers arrived, she had made an earlier incoherent 911 call); *Sumay*, 1998 WL 205345, at *6 (Doctors were entitled to qualified immunity for plaintiff's involuntary commitment, in part, because he was "hostile" and "argumentative"; the admitting physician had treated him in the past; and

24

examination showed he was experiencing paranoid delusions).  Rather, at most, reasonable officials would disagree on whether Kotbi violated Aouatif's rights, which is sufficient for purposes of qualified immunity.  *See Doninger v. Niehoff*, 642 F.3d 334, 349 (2d Cir. 2011); *see also Brock*, 2018 WL 3579099, at *10 ("Mere disagreements about a doctor's perceptions, diagnoses, and subsequent action . . . are not sufficient to raise material issues regarding the treatment decisions" made by [the doctor]." (alterations in *Brock*) (internal quotation marks omitted) (citation omitted)).

Moreover, "[q]ualified immunity under these circumstances seems particularly appropriate when considering how we would judge the legality of a contrary decision by [Dr. Kotbi]."  *Anthony I*, 2001 WL 741743, at *6.  If Kotbi had taken no action after a soft-spoken patient who he believed attempted suicide in the past called his personal cell phone on a Saturday, appeared to be delusional, behaved in an uncharacteristically angry manner, and hung up on him, he "could have stood fairly accused of callous indifference to the special needs" of one of his patients.  *Id*.  In light of the delicate circumstances and the decision that Kotbi was compelled to make between ensuring Aouatif's safety and ignoring possible warning signs of a dangerous psychotic episode, Kotbi should not be held liable for making the decision he did.

Although Aouatif suggests that Kotbi acted with a retaliatory motive by calling 911, subjective intent is not relevant to the objective qualified immunity standard unless evidence of improper motive is an element of the plaintiff's claim as defined by clearly established law.  *See Locurto v. Safir*, 264 F.3d 154, 169 (2d Cir. 2001) ("In the usual case where intent is not an element, bare allegations of malice coupled with otherwise legitimate government action do not yield a viable constitutional claim.").  Because unlawful intent is not an element of Aouatif's Fourth Amendment claim, Kotbi's subjective intent is not relevant to the qualified immunity

analysis. *See Waananen*, 343 F. Supp. 2d at 170 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996))); *see also Doninger*, 642 F.3d at 349 (noting that "the Supreme Court has stated that a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was . . . improperly motivated" and that "[e]vidence of subjective intent 'is simply irrelevant to [this] defense.'" (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588 (1998))).

Therefore, for the reasons stated above, summary judgment is granted as to Aouatif's Fourth Amendment claim against Dr. Kotbi.

## II.     Abuse of Process Claim

Under New York law, a malicious abuse of process claim lies against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (citations omitted); *see also Savino v. City of New York*, 331 F.3d 63, 76–77 (2d Cir. 2003). "The crux of a malicious abuse of process claim is the collateral objective element." *Kraft*, 696 F. Supp. 2d at 416. With respect to this third prong, the Second Circuit distinguishes between a malicious motive and an improper purpose, and "only the latter suffices." *Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 448 (E.D.N.Y. 2012) (citing *Savino,*331 F.3d at 77), *aff'd sub nom. Peter L. Hoffman, Lotte, LLC v. Town of Southampton*, 523 F. App'x 770 (2d Cir. 2013). Indeed, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution"; rather, plaintiff must "claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77.

Here, Aouatif asserts an abuse of process claim against Kotbi, alleging that he acted with a retaliatory motive in ordering her involuntary transport, and that she was only committed at Brookdale due to false information he provided the doctors there.  However, Aouatif's claim fails because a retaliatory motive cannot sustain an abuse of process claim.  *See Folk v. City of New York*, 243 F. Supp. 3d 363, 375 (E.D.N.Y. 2017) ("A collateral objective is not the same as a malicious motive and must exist beyond or in addition to [the] criminal prosecution . . . ." (internal quotation marks omitted) (citation omitted)); *Jimenez v. City of New York*, No. 14-CV-02994 (SAS), 2014 WL 5089392, at *5 (S.D.N.Y. Oct. 9, 2014).  In *Hoffman*, Judge Bianco recognized that, "[t]ypical scenarios in which courts in this circuit have sustained a claim of malicious abuse of process involve prosecutions for reasons wholly outside of the initial prosecution."  893 F. Supp. 2d at 448–49 (citing the example of *TADCO Constr. Corp. v. Dormitory Auth. of the State of New York*, 700 F. Supp. 2d 253, 272 (E.D.N.Y. 2010), in which defendant's alleged purpose in arresting plaintiff was to influence contract litigation).  Conversely, here, Aouatif has set forth no specific facts from which a reasonable jury could infer that Kotbi had any purpose other than seeking an emergency evaluation – which is a proper use of his power as a psychiatrist under New York law.  *See Friedman v. Self Help Cmty. Servs.*, No. 11-CV-3210 (NGG) (JMA), 2015 WL 1246538, at *20 (E.D.N.Y. Mar. 17, 2015) (Plaintiff failed to plead the third prong of an abuse of process claim because "[r]egardless of the alleged motive . . . the ultimate purpose of the conspiracy was to secure the involuntary commitment of plaintiff," which is "the purpose of the civil commitment process."), *aff'd sub nom. Friedman v. Self Help Cmty. Servs., Inc.*, 647 F. App'x 44 (2d Cir. 2016).

As for Aouatif's allegation that she was committed because Kotbi spread false information, there is no evidence in the record to support this claim.  Instead, as stated

previously, medical records show that it was the Brookdale doctors' own independent medical judgment that led them to admit Aouatif. Aouatif denies that she was depressed at the time in the face of medical records containing her own statements that indicate otherwise. However, again, as stated in *Kulak*, "bare denials of statements allegedly made by patients under such circumstances" do not defeat summary judgment. 88 F.3d at 76; *see also Kraft*, 696 F. Supp. 2d at 416–17 (plaintiff's "mere reliance" on "conclusory allegations" of doctors' improper purpose was insufficient to avoid summary judgment); *Crawford v. City of New York*, No. 05-CV-5358 (ARR) (RML), 2011 WL 13175925, at *16 (E.D.N.Y. Feb. 28, 2011) (plaintiff's "speculation" was insufficient to infer an improper motive without other support in the record).

### III.    Section 1985 Claim

Aouatif also asserts that defendants conspired to deprive her of her constitutional rights in violation of 42 U.S.C. § 1985. "In order to maintain an action under Section 1985, a plaintiff 'must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.'" *Webb v. Goord*, 340 F.3d 105, 110–111 (2d Cir. 2003) (quoting *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)). Summary judgment is warranted on this claim because the record contains no evidence from which a reasonable juror could conclude that any defendants entered into an agreement to inflict unconstitutional injury upon Aouatif, nor has she identified an overt act performed in furtherance of such a scheme. *See id.* (noting that "'dismissal of conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights' is proper" (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997))).

**IV.    Claim Against HHC**

HHC, a municipal corporation, is entitled to summary judgment because Aouatif has not demonstrated any grounds for municipal liability.  "A municipal entity cannot be held liable under Section 1983 on a *respondeat superior* theory."  *Bliven v. Hunt*, 478 F. Supp. 2d 332, 336 (E.D.N.Y. 2007) (citing *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691 (1978)). However, a municipal entity may be liable "where the municipality *itself* causes the constitutional violation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original) (citation omitted).  A municipal entity may be held accountable for "the single act of an employee with final policymaking authority in the particular area involved."  *Mejia v. City of New York*, 228 F. Supp. 2d 234, 243 (E.D.N.Y. 2002) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121–23 (1988)); *see also Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (noting that the existence of final policymaking authority is determined on the basis of state law).

The sole allegation against HHC in the second amended complaint is that HHC is Kotbi's employer.  (*See* SAC at 2, ¶ 11.)  This fact alone is not enough to withstand summary judgment, since there is no vicarious liability for municipalities under Section 1983.  *See Monell*, 436 U.S. at 691.  In her supplemental brief, Aouatif includes a new argument that she did not include in the pleadings – namely that her discharge from treatment at Kings County amounted to a violation of her Fourteenth Amendment rights and her "right to be treated at a public benefit corporation."  (Pl. Supp. Br. at 6.)  Aouatif alleges that Dr. Burkholer discharged her in retaliation for her threat to sue Kotbi, or in "an effort to protect Kotbi following his unlawful detention of plaintiff."  (*Id.*)  This claim fails for several reasons.

First, Aouatif does not appear to have suffered any injury stemming from a violation of her constitutional rights.  In fact, when she was discharged from Kings County, she was

29

receiving free psychological services at Brookdale.  (*See* Aouatif Aff. ¶ 7.)  Aouatif has not pointed to any case law that suggests she has a constitutional right to receive free outpatient mental health services simultaneously at two medical facilities.  Aouatif has no basis to demonstrate municipal liability if she cannot allege a violation of her constitutional rights.

Moreover, Aouatif has cited no state law or custom that grants final policymaking authority to the Medical Director of Outpatient Psychiatry (Burkholder's position at the time). Aouatif's unsupported allegation that Burkholder had the discretion to discharge patients does not establish that Burkholder had the authority to set policy for HHC as a whole – the evidence shows merely that Burkholder supervised Kotbi and consulted with him in determining to end Aouatif's treatment at Kings County.  *See Allen v. City of New York*, No. 03-CV-2829 (KMW) (GWG), 2007 WL 24796, at *20 (S.D.N.Y. Jan. 3, 2007) (NYPD Commissioner was not a policymaker with respect to treatment of arrestees even though he supervised arrest processing generally).  Accordingly, summary judgment is granted with respect to Aouatif's claims against HHC.

## V.    Claim Against the City of New York

Because Aouatif has not addressed her claim against the City in any of her briefs, the Court deems it abandoned and grants summary judgment thereon.  *See Folk*, 243 F. Supp. at 375 (dismissing claim as abandoned); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citing *Douglas v. Victor Capital Grp.*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998))). Moreover, despite her conclusory allegation that the City has a policy of not disciplining officers, there is no evidence in the record to support this claim, nor has Aouatif presented proof of any

municipal policy, as would be necessary to prevail on her claim.  *See Monell*, 436 U.S. at 690–91.  Thus, summary judgment is appropriate in favor of the City, as well.

### VI.    Claims Against John Does 1–10

In New York, Section 1983 claims are governed by a three-year statute of limitations.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015).  The alleged constitutional violations occurred in June 2005.  It has been far more than three years since Aouatif's claims have accrued, and she has not served or identified the ten police officers who allegedly responded to Kotbi's 911 call.  Accordingly, her claims against those officers are time-barred.  *See Ruane v. Cty. of Suffolk*, 923 F. Supp. 2d 454, 459 (E.D.N.Y. 2013).  Thus, even if this Court were to grant Aouatif leave to amend the second amended complaint to add the Does as named defendants, amendment would be futile.  An amended complaint naming the officers would not relate back to the date of the original pleading because Aouatif has not demonstrated that the Does received notice of the action, or knew or should have known that the action would have been brought against them but for a mistake concerning the proper party's identity.  *See* Fed. R. Civ. P. 15(c)(1)(C); see also *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 468 (2d Cir. 1995) (holding that lack of knowledge of the proper party's identity, as in the case of John Doe defendants, is not a "mistake" concerning that party's identity, and therefore plaintiff could not amend the complaint to name John Does after the statute of limitations had run), *modified on other grounds*, 74 F.3d 1366.  Granting leave to amend would not change the inevitable fact that Aouatif's claims against the Does are time-barred and are accordingly dismissed.

The Court has carefully considered Aouatif's remaining arguments and finds them to be without merit.

## **CONCLUSION**

For the reasons stated above, defendants' motion for summary judgment, (Doc. No. 57), is granted in its entirety. The Clerk of Court is respectfully directed to enter judgment accordingly, to mail a copy of this Memorandum and Order to Aouatif, to note the mailing on the docket, and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York
        May 31, 2019

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge